IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FRANCES MARTINEZ o/b/o | § | |
| ROSEMARY MARQU (dec'd), | § | |
| Plaintiff, | § | |
| | § | |
| | § | Civil Action No. 3:19-CV-1904-B-BH |
| | § | |
| ANDREW SAUL, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Frances Martinez seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying the claims of her deceased daughter, Rosemary Marquez (Plaintiff), for disability insurance benefits (DIB) and for supplemental security income (SSI) under Title II and Title XVI of the Social Security Act. (*See* docs. 1, 10.) Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **REVERSED in part**, and the case should be **REMANDED** for reconsideration.

## I. BACKGROUND

On April 2, 2013, Plaintiff filed her applications for DIB and for SSI, alleging disability beginning on November 1, 2012. (doc. 7-1 at 189, 193.)[2] Her claims were denied initially on May 15, 2013, and upon reconsideration on July 25, 2013. (*Id.* at 125, 138.) On August 7, 2013, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 142.) She appeared and testified at a hearing on June 17, 2014. (*Id.* at 42-84.) On October 30, 2014, the ALJ issued a

_____

[1]By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

decision finding her not disabled. (*Id.* at 37.)

Plaintiff requested review of the ALJ's decision, and the Appeals Council denied her request for review on March 14, 2016, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 7-10, 21-22.) She appealed the Commissioner's decision in federal court under 42 U.S.C. § 405(g), and on September 18, 2017, the case was remanded for further proceedings. *See Marquez v. Berryhill*, No. 3:16-CV-1367-D (BF), 2017 WL 4216989, at *5 (N.D. Tex. Aug. 31, 2017), *adopted by* 2017 WL 4122724 (N.D. Tex. Sept. 18, 2017).

On remand, the same ALJ held another hearing on March 12, 2019. (doc. 7-1 at 829-74.)[3] On June 5, 2019, the ALJ issued her decision finding Plaintiff not disabled. (*Id.* at 819.) Plaintiff's counsel submitted a Request for Extension to File Action in Federal District Court on July 15, 2019. (*Id.* at 754-803.) The Appeals Council denied this request, making the ALJ's decision the final decision of the Commissioner.[4] Plaintiff's mother timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

## A.    Age, Education, and Work Experience

Plaintiff was born on February 13, 1979. (doc. 7-1 at 42, 189.) She had completed the eleventh grade and could communicate in English. (*Id.* at 238.) She had past relevant work as a sales attendant. (*Id.* at 77.)

## B.    Medical, Psychological, and Psychiatric Evidence

Plaintiff was treated by Charles Tuen, M.D., between November 2, 2010 and December 12, 2011, for a seizure disorder and peripheral neuropathy. (doc. 7-1 at 390-413.) An electrodiagnostic

---

[3]Plaintiff passed away on May 28, 2017, and her mother was substituted as party. (*See* doc. 7-1 at 754.)

[4]The record does not contain the Appeals Council's response to this request; however, the Commissioner does not dispute Plaintiff's allegation that administrative remedies have been exhausted. (*See* doc. 10 at 9.)

study with nerve conduction velocity dated December 12, 2011, showed mild peripheral neuropathy. (*Id.* at 390-93.)

Plaintiff was hospitalized at Baylor Medical Center (Baylor) for intractable seizures from September 7, through September 10, 2011. (*Id.* at 521-42.) She reported having migraine headaches and progressive episodes of slurred speech for the past two weeks. (*Id.* at 521.)  She had two generalized tonic-clonic seizures the prior evening, and had two additional seizures while in the Emergency Room (ER). (*Id.*)  She had previously been diagnosed with epilepsy, Turner syndrome, insulin-dependent diabetes, hypothyroidism, osteoporosis, progressive hearing loss, and a history of heart murmur and of migraine headaches.  (*Id.*)  An electroencephalogram (EEG) on September 8, 2011, was abnormal and showed two focal electrographic seizures fifteen minutes apart, as well as continuous left hemispheric focal slowing suggestive of an underlying lesion. (*Id.* at 524.)  She was diagnosed with complex partial epilepsy by Menas Mewar, M.D., and was treated with Keppra, Cerebyx, Dilantin, Zonegran, and Ativan. (*Id.* at 521-22.)

On October 3, 2011, Plaintiff presented to neurologist Nicole Alyce Simpkins, M.D., for treatment of seizures. (*Id.* at 434-37.)  She reported awakening from sleep on two to three occasions with bruises, and a seizure while she was on a treadmill. (*Id.* at 434.)  Dr. Simpkins noted a concern for nocturnal seizures and opined that Plaintiff experienced both generalized tonic-clonic seizures and complex partial seizures. (*Id.*) On examination, she appeared awake and alert, followed commands, and had fluent speech, but had impaired proprioception of the left upper extremity. (*Id.* at 436.)  Dr. Simpkins assessed epilepsy and increased Plaintiff's Vimpat dosage. (*Id.*)

On October 24, 2011, Plaintiff was admitted to the ER at Baylor with two-day history of abdominal pain and vomiting. (*Id.* at 538-67.)  She rated her abdominal pain ten out of ten in

severity, with multiple episodes of emesis, and her blood sugar level was 588. (*Id.* at 538.) She was crying, appeared distressed and uncomfortable, and her behavior was anxious. (*Id.* at 550.) She was treated for diabetic ketoacidosis, was diagnosed with diabetes mellitus type I, hypothyroidism, osteoporosis, and history of epilepsy and Turner syndrome, and was discharged on October 27, 2011. (*Id.* at 538.)

On April 11, 2012, Plaintiff presented to Dr. Simpkins for follow-up. (*Id.* at 428-30.) She reported no seizures since her hospitalization in September 2011, but noticed occasional hand tremors and intermittent balance difficulty. (*Id.* at 429.) Dr. Simpkins adjusted Plaintiff's antiepileptic regimen due to the side effects of intermittent dizziness and tremor. (*Id.*)

On July 2, 2012, Plaintiff established care with Andrew Burke, D.O., for diabetes treatment. (*Id.* at 589-91.) She had a high blood sugar history and was underweight, but her physical examination was normal. (*Id.* at 589-90.) Dr. Burke assessed hyperlipidemia, type I diabetes, benign hypertension, unspecified Vitamin D deficiency, anemia, and seizure disorder, and he refilled her medications. (*Id.* at 591.)

Plaintiff returned to Dr. Burke for diabetes treatment between July 30, 2012, and October 4, 2012. (*Id.* at 576-88.) On July 30, 2012, she reported tolerating her current diabetic treatment, and she was started on Novolog. (*Id.* at 585-88.) On August 6, 2012, she reported leg swelling and foot numbness, and was assessed with edema of the right leg. (*Id.* at 580-83.) On September 20, 2012, Plaintiff reported complying with medication regimen and blood sugar testing, adhering to a diabetic diet and exercise program, and tolerating diabetic treatment. (*Id.* at 576.) Dr. Burke prescribed Synthroid for hypothyroidism, and Gabapentin for neuropathic pain. (*Id.* at 578.) On October 4, 2012, Dr. Burke noted that Plaintiff had not been taking Synthroid for two months, and

4

that her A1c, glucose, and TSH levels were "above high normal." (*Id.* at 569-73.)

On August 13, 2012, Plaintiff presented to Dr. Simpkins and reported one seizure, a generalized convulsion lasting one minute, while in medication transition. (*Id.* at 424-26.) She had some word-finding difficulty, but her slurred speech had improved. (*Id.* at 424.) She reported better balance but continued to have intermittent balance difficulty. (*Id.*) She also reported that her mood was "much better," and that she no longer experienced panic attacks. (*Id.*). Plaintiff was continued on her current regimen. (*Id.* at 426.)

On October 23, 2012, Plaintiff returned to Dr. Simpkins, complaining of total body pain and soreness. (*Id.* at 421-23.) She had tingling in her feet, pain in her feet and body, and some mild dizziness. (*Id.* at 421.) She reported having no interval seizures and tolerating her medications well. (*Id.*) Dr. Simpkins noted that Plaintiff was doing well from a seizure standpoint, and Gabapentin was increased because of her increased foot/body pain and tingling. (*Id.* at 423.)   On November 6, 2012, Plaintiff and her mother presented to Dr. Burke, complaining of motion sickness after being in the ER for vertigo and paresthesia. (*Id.* at 294.) Plaintiff's mother reported that Plaintiff had a few seizures before she was admitted to the hospital. (*Id.* at 297.) Plaintiff reported that she was unable to perform all activities of daily living due to recent increase in fear and anxiety, but denied depression, memory loss, mood changes, disturbing thoughts, or psychiatric disorders. (*Id.* at 294-95.) She also reported dizziness, tingling, numbness, and unsteady gait. (*Id.* at 295.) Dr. Burke assessed type I diabetes, stage II chronic kidney disease, hypothyroidism, hypertension, hyperlipidemia, seizure disorder, and vertigo. (*Id.* at 297.) He discussed diabetes and psychological problems of chronic disease with Plaintiff, and prescribed Valium and Zofran. (*Id.* 297-98.)

On November 7, 2012, Plaintiff established care with rheumatologist, Himanshu Patel, D.O.

(*Id.* at 305-08.) She reported "pain all over" for the past six to eight weeks, and was afraid of her ability to continue working due to her history of vertigo, fatigue, and pain flare-ups. (*Id.* at 305.) Plaintiff's neurology examination was positive for headaches, weakness, seizure, muscle cramps, and cognitive difficulties; her psychology examination was positive for depression and high stress, and negative for anxiety/panic attacks and difficulty sleeping; and her physical examination showed 12 of 18 fibromyalgia tender points. (*Id.* at 305-06.) Dr. Patel assessed fibromyalgia, diabetic neuropathy, polyarthralgia, unspecified epilepsy, diabetes mellitus, abdominal pain, and fatigue. (*Id.* at 306.) He discontinued Neurontin therapy, prescribed Lyrica, and placed her on off-work status for a week. (*Id.* at 307.)

On November 8, 2012, Plaintiff established care with Amanda Toye, M.D., for pain management. (*Id.* at 449-50.) She reported pain in her hands and feet, as well as soreness and sharp pains. (*Id.* at 449.) She had a history of small seizures and neuropathy from diabetes, and she was under more stress because she was worried about not working and losing her job. (*Id.*) Physical examination showed tenderness in her calves; an antalgic gait; 4/5 strength with hip flexion, knee extension, and dorsiflexion, likely due to decreased effort or pain; and hands that were erythematous. (*Id.* at 449-50.) Dr. Toye assessed diabetic neuropathy and fibromyalgia, and prescribed Norco and Zanaflex. (*Id.* at 450.) She referred Plaintiff to interdisciplinary pain clinic for pain coping skills and to warm water therapy for fibromyalgia pain, and placed her on leave from work for a couple of days. (*Id.*)

On November 29, 2012, Plaintiff returned to Dr. Patel. (*Id.* at 302-03.) She continued complaining of pain "all over" and of fatigue, and 11 of 18 fibromyalgia tender points were noted on examination. (*Id.*) Dr. Patel discontinued Lyrica, prescribed Savella for fibromyalgia, and

administered a B12 injection for fatigue. (*Id.* at 303.)

On November 30, 2012, Plaintiff presented to Dr. Toye with foot and thigh pain that was burning and radiated from her feet to her calves, and worsened when walking. (*Id.* at 447-48.)  Dr. Toye noted that Plaintiff's feet were tender to palpation. (*Id.*)  She prescribed ten more days of Norco to be followed by a Butrans patch, and recommended therapy for opiate screening and for depression and anxiety management. (*Id.*)

Between December 12, 2012, and January 14, 2013, Plaintiff attended physical therapy at Baylor Institute for Rehabilitation to improve balance, function, motor control, and pain management, as well as to increase range of motion and strength. (*Id.* at 311-28.)  She was discharged from therapy on April 22, 2013, after missing appointments and failing to follow-up. (*Id.* at 311-12.)

On December 28, 2012, Plaintiff returned to Dr. Toye, complaining of diffuse pain and difficulty sleeping.  (*Id.* at 445-46.)  She reported aching pain in her back and legs that radiated into her feet; the pain increased with prolonged periods of work and decreased with medication and rest. (*Id.* at 445.)  She did not notice improvement with Savella or the Butrans patch, but there were no compliance issues or problems with the medication. (*Id.*)  Dr. Toye noted tenderness to palpation over Plaintiff's lower extremities and feet. (*Id.*)  She prescribed a Fentanyl patch and Norco, and determined that Plaintiff should be placed on leave from work for a couple of weeks while trying the patch. (*Id.* at 445-46.)

On January 2, 2013, Dr. Toye completed a medical source opinion for Plaintiff.  (*Id.* at 441.)  She noted that Plaintiff had fibromyalgia and diabetic neuropathy, and that she had been treating her pain since November 2012. (*Id.*)  She opined that Plaintiff was "[u]nable to sit through [a] full day

of work" because of increased pain, and that she should be on leave from work for 3 to 4 weeks to adjust to the Butrans patch. (*Id.*)  She also opined that Plaintiff could only return to work with restrictions, including decreased work hours and frequent breaks. (*Id.*)

On January 11, 2013, Plaintiff presented to Dr. Patel for a follow-up visit. (*Id.* at 300-01.) She reported pain improvement and with good and bad days. (*Id.*)  Dr. Patel increased her Savella dosage, and administered a Prolia injection. (*Id.* at 301.)

On January 25, 2013, Plaintiff returned to Dr. Toye with generalized pain.  (*Id.* at 443-44.) She reported aching and cramping pain that radiated down her posterior legs, which worsened after standing for 10 minutes and decreased with medication and rest. (*Id.* at 443.) Her current pain level was a 9 out of 10, but medications reduced it to a 3 or 4 out of 10. (*Id.*)  She attended aqua therapy twice a week, but had not seen a psychiatrist because she was "worried." (*Id.*) Plaintiff also reported that she was sleeping better and that the Fentanyl patch was helping, but that the increased dosage of Savella caused blurry vision. (*Id.*)  Dr. Toye noted that there was no tenderness with palpation over her calf or thoracic back, but that a thoracic or lumbar MRI might be needed if her pain changed or increased in severity. (*Id.* at 443-44.)  She increased the Fentanyl patch dosage and continued with Norco, but did not continue Plaintiff on leave from work. (*Id.*)

On March 29, 2013, Plaintiff presented to Parkland Hospital (Parkland) for medications refill, and reported that her blood sugar level was 400 after eating a biscuit. (*Id.* at 286.) Laboratory results showed her glucose level was 421 and her A1c level was 11.8. (*Id.* at 288.)   The treating physician diagnosed type I diabetes mellitus and refilled her prescriptions for insulin, Gabapentin, Hydrocodone-acetaminophen, Vimpat, Lamotrigine, and Pantoprazole. (*Id.* at 291-92.)

On May 5, 2013, State Agency Medical Consultant (SAMC) Frederick Cremona, M.D.,

completed a physical residual functional capacity (RFC) assessment based on the medical evidence. (*Id.* at 89-91.) He opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit for about 6 hours in an 8-hour workday; push and pull unlimited weight (other than shown for lift and carry); climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds, with environmental limitations of avoiding even moderate exposure to hazards such as unprotected heights, open flames, and open and moving machinery. (*Id.* at 89-90.) Based on her physical RFC, Plaintiff could perform her past relevant work as pawnbroker. (*Id.* at 92.) Dr. Cremona opined that Plaintiff's alleged limitations were not wholly credible or supported by the evidence of record. (*Id.* at 91.)[5]

SAMC Karen Lee, M.D., completed a physical RFC that mirrored Dr. Cremona's physical RFC on July 23, 2013. (*Id.* at 107-10.) She also affirmed Dr. Cremona's opinion that Plaintiff's alleged limitations were not wholly credible or supported by the evidence of record. (*Id.* at 110.)

Between April 12, 2013, and September 26, 2013, Plaintiff presented to Parkland for diabetes and fibromyalgia treatment and for medication refills. (*Id.* at 361-76.) On July 1, 2013, Plaintiff reported pain in her feet that was a 5 out of 10 in severity, but that she usually had generalized pain. (*Id.* at 370.) On examination, she was positive for myalgias and exhibited musculoskeletal tenderness. (*Id.* at 371.) On September 26, 2013, the treating physician noted that Plaintiff had a history of noncompliance, but appeared compliant recently. (*Id.* at 375.) She reported that she lost her insurance and was currently out of insulin. (*Id.*) She was instructed on diabetes care and was continued on her current treatment regimen. (*Id.* at 376.)

---

[5]A disability examiner also noted that Plaintiff did not initially allege any mental limitations, and that further investigation of a severe mental impairment was not warranted. (doc. 7-1 at 87.)

On July 31, 2013, Plaintiff established care with Metrocare Services (Metrocare) for mental health treatment and was seen by an Advanced Practice Nurse (APN). (*Id.* at 467.)  She reported sadness, low motivation, and irritability, as well as two suicide attempts three years ago. (*Id.* at 467-68.)  Her mental examination was generally normal, except she had fair insight, judgment, and impulse control, and her mood and affect was sad. (*Id.* at 468.)  The APN noted her depressive symptoms as increased sadness, low motivation, irritability, anhedonia, anergia, poor appetite, insomnia, feelings of worthlessness and helplessness, and social isolation and withdrawal; her anxiety symptoms were noted as feeling on edge, restlessness, palpitations, and shakiness. (*Id.* at 469.) She assessed tentative major depressive disorder and prescribed Diazepam for anxiety and Celexa for depression. (*Id.*)

Plaintiff returned to Metrocare for mental health appointments on August 29, October 29, and December 12, 2013. (*Id.* at 459-46.)  She continued to have depression because she could not work due to her other health issues and "fe[lt] like a burden on her family," as well as anxiety because of financial worries.  (*Id.* at 446.)  She reported that her disability claim had been denied and that she was appealing the decision. (*Id.*)  Her mental status exam was stable and Celexa was increased in December 2013. (*Id.* at 460, 463.)

On December 23, 2013, Plaintiff presented to Parkland for medications refill and reported that she did not take her insulin in the morning. (*Id.* at 377.)  Her blood sugar level was 470, but she declined further evaluation and treatment. (*Id.* at 379.)  Plaintiff returned to Parkland on January 10, 2014, and was prescribed Lamotrigine and Vimpat for seizures and was referred for an epilepsy monitoring unit. (*Id.* at 471-72.)

On April 7, 2014, Plaintiff returned to Metrocare for medications refill. (*Id.* at 455.)  She

reported being "okay more or less," but she had been off her medications for two months and wanted to continue with the same medication regimen. (*Id.*) She had depressive symptoms, anxiety, and nervousness, but she denied insomnia, racing thoughts, restlessness, difficulty concentrating, anhedonia, hallucinations, and suicidal or homicidal ideation. (*Id.*) A Qualified Mental Health Professional (QMHP) assigned Plaintiff a Global Assessment of Functioning (GAF)[6] score of 49, and noted her diagnoses as major depressive disorder and generalized anxiety disorder. (*Id.* at 452.)

On June 10, 2014, Plaintiff presented to Parkland to establish care for seizures. (*Id.* at 662-65.) She reported that her seizures started at age 30, and that her aunt witnessed most of her seizures. (*Id.* at 662.) She had "small seizures" a few times a week, involving upper body shaking and her eyes rolling back or glazing over, and she had "big seizures" once a month, involving full body convulsions with bowel incontinence. (*Id.*) She was continued on Lamictal for unspecified epilepsy. (*Id.* at 665.)

On June 13, 2014, Plaintiff presented to Gregory Graves, M.D., at Metrocare for a functional disability assessment. (*Id.* at 481-84.) She reported continued depression, forgetfulness, variable concentration, low energy and fatigue "most of the time," difficulty sleeping, and frequent crying. (*Id.* at 484.) She was able to focus for only two hours at a time to watch TV or to read, and she did not feel safe bathing alone for fear of falling. (*Id.*) Dr. Graves noted that her affect was blunted and that she appeared "very fatigued." (*Id.*)

Dr. Graves also completed a "Medical Assessment Of Ability To Do Work-Related

---

[6]GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001). A GAF score of 40 to 50 represents serious symptoms, such as suicidal ideation and severe obsessional rituals, or a major impairment in several areas, such as work and school. *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* p. 34 (4th ed. 1994).

Activities (Mental)" for Plaintiff. (*Id.* at 481-83.)  He opined that she had an "extreme loss of ability" to carry out detailed but uninvolved instructions; maintain regular attendance and be punctual within customary tolerances; perform at a consistent pace without an unreasonable number and length of breaks; accept instructions and respond appropriately to criticism from supervisors; behave in an emotionally stable manner; cope with normal work stresses; and finish a normal work week without interruption from psychologically based symptoms. (*Id.* at 481-82.)  He also opined that she had a "substantial loss of ability" to act appropriately with the general public; get along with co-workers or peers; and respond appropriately to changes in a routine work setting. (*Id.*)  Dr. Graves indicated that the severity of Plaintiff's condition was evidenced by crying spells, anhedonia, appetite and sleep disturbance, low energy, chronic disturbance of mood, difficulty thinking and confusion, chronic depression, and suicidal thoughts. (*Id.* at 482.)  He explained that he had considered Plaintiff's incidents of "doing well" when he assessed her limitations, and that they were consistent with any symptom improvements in the clinical notes. (*Id.* at 483.)  He anticipated that Plaintiff's condition and treatment would cause her to be absent from work more than four days per month, and that her mental disorders were likely to exacerbate the degree of disability she experienced from her physical impairments. (*Id.*)

Plaintiff was admitted to Baylor from June 26 to July 4, 2014, after experiencing two tonic-clonic seizures.  (*Id.* at 596-98.)  While in the ER, she had a third seizure followed by vertigo and vomiting.  (*Id.* at 596.)  Her A1c level at arrival was 14.8, and the treating physician suspected noncompliance with medications. (*Id.* at 597.)  EEG monitoring captured multiple spells with no epileptiform correlation, and a head CT scan showed no evidence of acute intracranial abnormality. (*Id.*) The neurology department was consulted, but it could not rule out epilepsy. (*Id.*)  Plaintiff was

discharged on July 4, 2014, on Keppra, Gabapentin, and Lamotrigine, with instructions to engage in cognitive behavioral therapy. (*Id.*)

Plaintiff was admitted to Parkland from July 10 to 13, 2014, for seizure characterization, and she was examined by Paul C. Ness, M.D., Yolan Shaw, M.D., and Afsaneh Shirani, M.D. (*Id.* at 491-519, 633-61, 667-97.)  She became hypoglycemic during admission, and EEG monitoring showed no evidence of seizures and no events. (*Id.* at 634.)  Dr. Van Ness assessed psychogenic non-epileptic seizures, discontinued seizure medications, and advised Plaintiff to undergo cognitive behavioral therapy. (*Id.* at 499-500.)

On July 16, 2014, Dr. Shirani responded to interrogatories on Plaintiff's medical history. (*Id.* at 486-89.)  He reported that Plaintiff would likely miss about four to eight days of work per month, but that this needed to be confirmed by her primary care provider. (*Id.* at 486.)  He noted that her primary care provider should respond to the remaining interrogatories because he was involved in her care only during her recent admission at the Epilepsy Monitoring Unit at Parkland. (*Id.* at 487.)

On July 23, 2014, Plaintiff presented to Parkland for medications refill. (*Id.* at 714.)  She reported back and leg pain and requested Norco for extremity pain because she no longer received Fentanyl patches due to loss of insurance. (*Id.*)  She received refills for insulin, Simvastatin, Tizanidine, Gabapentin, Pantoprazole, and Levothyroxine. (*Id.* at 714-15.)

On October 21, 2014, Plaintiff returned to Parkland for medications refill. (*Id.* at 723.)  She reported no recent seizure activity, but had new onset of diarrhea. (*Id.*)  She was intermittently compliant with her thyroid mediation but did not take it daily. (*Id.*)  She was assessed with diarrhea and hypokalemia, prescribed potassium and Meclizine, and received refills for Simvastatin, Levothyroxine, and insulin. (*Id.* at 727).

On December 3, 2014, Plaintiff presented to Parkland for right shoulder and foot pain from a fall two weeks ago. (*Id.* at 1057-72.)  Right foot X-rays showed impacted fractures of the second, third, and fourth metatarsal necks, with early healing. (*Id.* at 1060.)  On examination, she had tenderness to the shoulder and foot, and her mental status was normal. (*Id.* at 1065.) Plaintiff was advised to follow-up with the orthopedic clinic in two weeks, and her home medications were refilled. (*Id.* at 1072.)

C.     **October 30, 2014 Hearing**

On October 30, 2014, Plaintiff, her aunt, and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 42-84.)  Plaintiff was represented by an attorney. (*Id.* at 44.)

1.     **Plaintiff's Testimony**

Plaintiff testified that she was four-foot-nine and weighed 88.2 pounds. (*Id.* at 52.) When she was working, she weighed between 100 and 110 pounds, but attributed her weight loss to less appetite. (*Id.*)  She was diagnosed with diabetes when she was 14 or 15 years old, and started taking insulin when she was between 21 and 23 years old. (*Id.* at 53.)  She previously worked at a pawnshop for 15 years, and quit working because she had to miss work one to two times every two weeks due to health problems. (*Id.* at 53-54.)  Her health condition also caused her difficulties at work; she lost track of time, had occasional blackouts, fell down the stairs a couple of times, and had a seizure when her blood sugar level dropped. (*Id.* at 54.)

Plaintiff took two kinds of insulin daily, checked her blood sugar three times per day, and was placed on an 1,800 calorie diet after a recent hospitalization for diabetes. (*Id.*)  She previously followed a diabetic diet "on and off," but recently needed reminders from family about diet-appropriate foods and medication intake because of increased memory problems. (*Id.* at 56.)  She

14

currently lived with her mother, had previously lived with her aunt and sister, and had never lived by herself. (*Id.* at 57-58.) She struggled with keeping her blood sugar stable, but had trouble getting an appointment at Parkland to discuss it with her doctors. (*Id.* at 58-59.)

Plaintiff ultimately quit her job because she had very severe pain throughout her body from fibromyalgia and was on "too many painkillers." (*Id.* at 59.) When she had work health insurance, she received treatment for her epilepsy from a neurologist, Dr. Simpkins, and treatment for her fibromyalgia from a rheumatologist, Dr. Patel, and a pain management specialist, Dr. Toye. (*Id.* at 60-62.) She was prescribed a muscle relaxer and pain pills, but still had fibromyalgia pain everyday. (*Id.* at 62.) She believed she had one to two seizures a week, but "most of the time" she could not remember if and when they occurred. (*Id.* at 63.) Her aunt witnessed her seizures and told her about most of them. (*Id.* at 63-64.) She had been monitored for seizures "a while ago," and a neurologist at Parkland wanted to admit her for three to seven days for additional monitoring. (*Id.* at 64-65.)

Plaintiff was depressed because she had to depend on everyone else to support and take care of her, and because she felt like a burden to her family. (*Id.* at 72.) She had problems with balancing and walking and would leave the bathroom door unlocked when showering because she was afraid of falling. (*Id.* at 74.) She had pain in her feet that sometimes felt like somebody was hammering them with nails. (*Id.* at 75.) Her pain worsened if she stood for too long or if she walked a lot. (*Id.* at 75-76.)

### 2.    Aunt's Testimony

Plaintiff's aunt testified that she moved in with Plaintiff a year ago to help take care of her. (*Id.* at 67.) She noticed that Plaintiff had seizures once or twice a week, and that most of the time her body would jerk and her eyes would roll back, but sometimes she would just stare into

space. (*Id.* at 68.)  Family members needed to remind Plaintiff to take her medication. (*Id.*) She knew that Plaintiff also had seizures during the night because her undergarments would be soiled after a nocturnal seizure. (*Id.* at 69.)  Plaintiff would be exhausted after a seizure and would need an hour or two to lay down and recover. (*Id.* at 69-70.)  Plaintiff was constantly tired and fatigued and usually napped and rested six to eight hours a day. (*Id.* at 70.)  She observed Plaintiff crying and believed that she was depressed because she was unable to do things for herself anymore. (*Id.* at 71-72.)  She recalled Plaintiff losing her balance when trying to carry an eight-pound bag of ice. (*Id.*) She also noticed that Plaintiff did not have any memories of most of her seizures. (*Id.* at 72.)  She confirmed that neurology at Parkland wanted to admit Plaintiff for an epilepsy study, and that she struggled with getting appointments. (*Id.* at 72.)

### 3.    VE's Testimony

The VE testified that Plaintiff had previous work experience as a sales attendant, which was light, unskilled work with a Specific Vocational Preparation (SVP) of 2. (*Id.* at 77.)  A hypothetical person with the same age, education, and work experience history as Plaintiff, who could lift and carry ten pounds; stand and walk two out of eight hours; sit six out of eight hours; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; never balance, crawl, or kneel; frequently stoop; occasionally crouch; never work near hazards or drive as a job duty; understand, remember, and carry out one- to two-step instructions; and occasionally have contact with co-workers, supervisors, and the public, could perform sedentary, unskilled work, including an addresser, a cutter and paster, and a callout operator. (*Id.* at 77-79.)  An individual would be precluded from sustained work activity if her seizures resulted in a 15 percent or more loss on performance rate, or if she had to miss four or more days of work per month for health issues. (*Id.*

16

at 80-82.)

**D.    March 12, 2019 Hearing**

After the case was remanded from the district court, Plaintiff's mother, a medical expert (ME), and a VE testified at a hearing on April 10, 2014. (*Id.* at 829-74.)  Plaintiff's mother, as substituted party, was represented by an attorney. (*Id.* at 831.)

**1.    ME's Testimony**

The ME testified that he had reviewed Plaintiff's medical records, and that he had sufficient records to give an opinion on her mental health impairments. (*Id.* at 839.)  He was a licensed clinical psychologist and was familiar with the Social Security listings for mental health impairments. (*Id.* at 839, 841.)  He opined that Plaintiff did not meet or medically equal any listing for mental health impairments, and that none of the criteria in Paragraph B and Paragraph C were present. (*Id.* at 840.)  He assessed Plaintiff's ability to understand, remember, and apply information and to concentration, persistence, and maintaining pace as mild, and her ability to interact with others and adapt and manage herself as none. (*Id.*)

The ME testified that Plaintiff was diagnosed with major depressive disorder, generalized anxiety disorder, and psychogenic non-epileptic spells, but he believed they were non-severe conditions. (*Id.* at 841.)  He opined that she was functioning generally independently, that her ability to be effective was very mild or slightly limited, and that the mental statuses from the Metrocare records showed her mental impairments would have "absolutely no effect on her ability to work." (*Id.* at 841-42.)  He opined that the medical source statement by Dr. Graves conflicted with the mental health statuses noted in the records from Metrocare and Plaintiff's other medical care providers. (*Id.* at 842-43.)  He testified that her depressive symptoms could interfere with her focus,

17

attention, and concentration, but those issues were not documented throughout the records, and there were no records of psychiatric hospitalizations, interventions, or significant psychotropic medication. (*Id.* at 845.)  The ME did not disagree with her anxiety and depression diagnoses, but opined that her depression and anxiety symptoms were managed well with her medication. (*Id.* at 846.)

### 2.    Mother's Testimony

Plaintiff's mother testified that Plaintiff lived with her from 2012 to October 2014.  (*Id.* at 848.) She first learned that Plaintiff's illnesses were causing problems at work at the end of 2012, when her boss called and told her to pick up Plaintiff because she had a seizure at work. (*Id.*) When Plaintiff returned to work, she was always tired and had problems. (*Id.* at 848-49.)  Plaintiff's boss eventually told Plaintiff that she should get disability because she could not do the work. (*Id.* at 849.) After Plaintiff stopped working, she became very depressed and said that she felt worthless.  (*Id.*) She continued having seizures and was very tired and weak afterwards. (*Id.* at 849-50.)  Her fibromyalgia affected her legs, feet, hands, and arms, and she complained about walking because her legs would hurt. (*Id.* at 850.)  Plaintiff would lock herself up in her room most days and needed to lay down and rest at least half of the day. (*Id.*)  She struggled picking things up with her hands and needed to use a walker when she went to the bathroom or kitchen. (*Id.* at 850-52.)

Plaintiff's doctors decided that she needed psychiatric care, and she started going to Metrocare for mental health treatment. (*Id.* at 852-53.)  She recalled Plaintiff crying at least two times a week, and she had really low energy levels. (*Id.* at 856.)  She noticed that Plaintiff had difficulty thinking, concentrating, and remembering; that she lost interest in doing things she enjoyed doing, like attending basketball games; that she stopped eating and was losing weight; and

that she struggled sleeping at night and napped a lot during the day. (*Id.* at 856-59.)  Plaintiff took

baths every other day because she was afraid of falling, and she sometimes skipped a day of brushing

her teeth because she was too tired to go to the restroom. (*Id.* at 859-60.)  She testified that during

the relevant period, Plaintiff's personality changed, and she isolated herself from others. (*Id.* at 861.)

    **3.**      **VE's Testimony**

The VE testified that Plaintiff had previous work experience as a salesperson, general

merchandise, which was light semiskilled work with a SVP of 3.  (*Id.* at 862.)  A hypothetical person

with the same age, education, and work experience history as Plaintiff would not be able to sustain

her prior work with the following limitations: lift and carry 10 pounds maximum; stand and walk

for two of eight hours; sit for six of eight hours; climb ramps and stairs occasionally, but never climb

ladders, ropes, or scaffolds; balance, stoop, kneel, crouch, and crawl frequently, with no assistive

device required for ambulation; avoid working near hazards, including exposed moving machinery,

unprotected heights, and open flames; never operate a vehicle or heavy equipment as a job duty; and

understand, remember, and carry out detailed, but not complex instructions. (*Id.* at 864.)  There was

other available work that the hypothetical person could perform, including cutter and paster

(sedentary and SVP-2) with 82,605 jobs nationally; document preparer (sedentary and SVP-2) with

157,928 jobs nationally; and final assembler (sedentary and SVP-2) with 25,820 jobs nationally, all

of which were consistent with the DOT. (*Id.* at 864-85, 871.)  To maintain employment, the

tolerance for absenteeism was no more than a day per month, and the tolerance for being off task

outside of work breaks was 15 percent of the time. (*Id.* at 865.)  If the same hypothetical person also

needed assistance for lifting and carrying, was only able to sit for 21 to 30 minutes, stand for 10 to

15 minutes, and walk for 10 to 15 minutes at a time, and was unable to climb at all, she would not

be able to maintain and sustain any job in the national economy. (*Id.* at 866.) If the original hypothetical person also had an extreme loss in her ability to accept instruction and respond appropriately to criticism from supervisors, behave in an emotionally stable manner, finish a normal work week without interruptions from psychologically-based symptoms, or cope with normal work stress without exacerbating psychologically-based symptoms, she would not be able to sustain competitive employment. (*Id.* at 867-68.)[7]

E.    **ALJ's Findings**

The ALJ issued a decision denying benefits on June 5, 2019. (*Id.* at 806-19.) At step one, she found that Plaintiff had not engaged in substantial gainful activity since her onset date of November 1, 2012. (*Id.* at 809.) At step two, the ALJ found that she had the following severe impairments: seizures or seizure-like spells related to psychological conditions, diabetes mellitus and diabetic neuropathy, fibromyalgia, and chronic pain syndrome. (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the Social Security regulations. (*Id.* at 811-12.)

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), with the following limitations: climb ramps or stairs occasionally, but never ladders, ropes, or scaffolds; balance, stoop, kneel, crouch, or crawl frequently, with no assistive device required for ambulation; avoid exposed moving machinery, unprotected heights, and open flames; never operate a vehicle or heavy equipment as a job duty; and

---

[7]Before the hearing concluded, Plaintiff's attorney requested that, if the ALJ intended to give Dr. Graves's opinion less weight than that of the ME, she subpoena Dr. Graves and ask him to defend his opinion. (doc. 7-1 at 873.) The ALJ denied this request. (*Id.*)

understand, remember, and carry out detailed but not complex instructions. (*Id.* at 812.)  At step four, the ALJ determined that Plaintiff was unable to perform her past work as a sales person, general merchandise. (*Id.* at 817.)  At step five, the ALJ found that although Plaintiff was not capable of performing past relevant work, considering her age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that she could perform.  (*Id.* at 818.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from November 1, 2012, the alleged onset date, through October 31, 2014.[8] (*Id.* at 819.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson*

---

[8]Although the ALJ concluded that Plaintiff had not been under a disability "through the date of this decision," the ALJ's decision noted that Plaintiff's mother had filed a new application after Plaintiff died, and a different ALJ found that Plaintiff was disabled from October 31, 2014, through the date of death on May 28, 2017. (*See* doc. 7-1 at 806.)

*v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See Id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## III.  ISSUES FOR REVIEW

Plaintiff presents three primary issues for review:

1.    The Fifth Circuit held claimants have an automatic right to subpoena a reporting physician. The Commissioner instructs ALJs they must grant all subpoena requests made prior to closing the record. Did the ALJ comply with the law if [s]he did not grant [Plaintiff's] request to subpoena Dr. Graves?

2.    An ALJ has a duty to fully and fairly develop the record. Did the ALJ fail to fulfill that duty by failing to inquire as to the reasons for [Plaintiff's] non-compliance with treatment?

a.    SSR 82-59 explains how treatment compliance under 20 C.F.R. § 416.930 is applied.

23

      b.      The ALJ implied [Plaintiff] was disabled by her seizures and diabetes.

      c.      The ALJ made no findings about good cause.

3.      The Commissioner's policy is that he will always give greater weight to a treating source's opinion than to the opinions of non-treating sources. Can the ALJ's RFC assessment be supported by substantial evidence if [s]he rejected the treating specialists' opinions without following the regulatory requirements for weighing opinion evidence?

      a.      The ALJ did not conduct the required analysis in discrediting the opinions of treating specialists Drs. Graves and Toye.

      b.      Medical Opinions are important evidence when determining a claimant's residual functional capacity.

      c.      The ALJ, in finding controlling weight should not be assigned to Drs. Graves' and Toye's treating specialists' opinions, erred in failing to recognize such opinions were still entitled to deference.

      d.      The Administrative Law Judge's errors harmed [Plaintiff].

(doc. 10 at 6-7.)

**A.**    **Subpoena Request**

Plaintiff argues that the ALJ erroneously denied her request to subpoena Dr. Graves because she has an absolute right to subpoena a reporting physician. (doc. 10 at 21-23.)

In *Richardson v. Perales*, 402 U.S. 389, 402 (1971), the Supreme Court held that written reports of physicians that examined the claimant, despite their hearsay character, "may constitute substantial evidence ... when the claimant has not exercised his right to subpoena the reporting physician and thereby provide[d] himself with the opportunity of cross-examination of the physician." The Fifth Circuit has interpreted this to mean that when a claimant exercises the right to subpoena, "a claimant has the right to cross-examine an examining physician." *Lidy v. Sullivan*,

911 F.2d 1075, 1077 (5th Cir. 1990).

A claimant who wishes to "subpoena documents or witnesses must file a written request for the issuance of a subpoena with the administrative law judge . . . at least 10 business days before the hearing date." *See* 20 C.F.R. §§ 404.950(d)(2), 416.1450(d)(2).  The request must: (1) give the names of the witnesses to be produced; (2) provide the address or location of the witnesses with sufficient detail to find them; (3) state the important facts that the witness is expected to prove; and (4) "indicate why these facts could not be proven without issuing a subpoena." *Id*.  If the claimant misses the deadline for a subpoena request, and if the ALJ has not yet issued a decision, "the ALJ may deny the request at his or her discretion, unless the circumstances in 20 C.F.R. §§ 404.935(b) and 416.1435(b) apply." *See* Hearing Appeals and Litigation Law Manual (HALLEX) § I-2-5-78.[9] Those circumstances include:

(1) Our action misled you;

(2) You had a physical, mental, educational, or linguistic limitation(s) that prevented you from informing us about or submitting the evidence earlier; or

(3) Some other unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier. Examples include, but are not limited to:

(i) You were seriously ill, and your illness prevented you from contacting us in person, in writing, or through a friend, relative, or other person;

(ii) There was a death or serious illness in your immediate family;

(iii) Important records were destroyed or damaged by fire or other accidental cause; or

(iv) You actively and diligently sought evidence from a source and the

---

[9] HALLEX can be accessed at https://www.ssa.gov/OP_Home/hallex/I-02/I-2-5-78.html (last visited August 31, 2020).

> evidence was not received or was received less than 5 business days prior to
> the hearing.

*See* 20 C.F.R. §§ 404.935(b), 416.1435(b).

Here, Plaintiff first made the request to subpoena Dr. Graves at the conclusion of the second administrative hearing. (*See* doc. 7-1 at 873.) Her attorney requested that the ALJ subpoena Dr. Graves to defend his opinion if she intended to give it less weight than that of the ME, and the ALJ denied this request. (*Id.*) Because Plaintiff's subpoena request was not made 10 business days before the second administrative hearing, it was untimely. *See* §§ 404.950(d)(2), 416.1450(d)(2), and HALLEX I-2-5-78(B)(1). Plaintiff also did not comply with the requirements of §§ 404.950(d)(2) and 416.1450(d)(2) because her subpoena request was not in writing and did not identify the important facts that Dr. Graves was expected to prove or indicate why they could not have been proven without issuing a subpoena. *See* §§ 404.950(d)(2), 416.1450(d)(2); *see also Boasso v. Berryhill*, No. CV 18-05623, 2019 WL 3526711, at *5 (E.D. La. Mar. 14, 2019), *adopted in part and rejected in part by* 2019 WL 3526532 (E.D. La. May 30, 2019) (explaining that the ALJ did not err in denying request for issuance of subpoena that was untimely and that did not identify any important facts that the treating physician's records were expected to prove). She has not alleged any of the circumstances in §§ 404.935(b) and 416.1435(b) to excuse her untimeliness. *See Ward v. Comm'r of Soc. Sec.*, No. 3:18-CV-1529-J-MAP, 2019 WL 5168659, at *5 (M.D. Fla. Oct. 15, 2019) ("Plaintiff's letter is a bare-bones request for a subpoena and does not describe her good faith efforts to obtain the Chrysalis Health records on time; the ALJ did not abuse his discretion in denying the subpoena request."). Because Plaintiff's request to subpoena Dr. Graves was untimely and it did not comply with the requirements of §§ 404.950(d)(2), 416.1450(d)(2) and HALLEX I-2-5-78, and because her circumstances did not meet any of the conditions in §§ 404.935(b) and

416.1435(b), the ALJ did not err in denying this request. *See Boasso,* 2019 WL 3526711, at *5; *Ward*, 2019 WL 5168659, at *5.

Plaintiff argues that "the Commissioner's established policy is that '[i]n the Fifth Circuit, if a claimant requests a subpoena to cross-examine an examining physician, and the claimant makes the request *prior to the closing of the record*, the ALJ must issue the subpoena.'" (doc. 12 at 3-4 (quoting HALLEX I-2-5-78 (emphasis added by Plaintiff)). Although Social Security administrative hearings must follow the policies set forth in HALLEX, it is well-established that "HALLEX does not carry the authority of law," and the ALJ's error warrants remand only if Plaintiff was prejudiced by the error. *See Morgan v. Colvin*, 803 F.3d 773, 777 (5th Cir. 2015) (citing *Newton*, 209 F.3d at 459); *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (the violation of a ruling is procedural error warranting reversal "only when [the] complainant affirmatively demonstrates ensuant *prejudice*) (emphasis in *Bornette*) (citations omitted). In the Fifth Circuit, "[p]rocedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)). To establish prejudice, Plaintiff must show that the ALJ's denial of her request for the issuance of a subpoena might have led to a different decision of disability. *See Newton*, 209 F.3d at 458; *McNair*, 537 F. Supp. 2d at 837.

Even if the ALJ erred in not granted Plaintiff's unwritten request for subpoena of Dr. Graves at the end of the second administrative hearing, she does not argue that she was prejudiced. (*See* doc. 10.) She does not present any evidence that could or would have been adduced from subpoenaing Dr. Graves that would have led to a different result in the case. *See Lindsey v. Comm'r of Soc. Sec.*

*Admin.*, No. 2:08CV233-WAP-DAS, 2009 WL 4738168, at *6 (N.D. Miss. Dec. 4, 2009) (HALLEX violation did not prejudice the claimant where he failed to proffer any evidence that would have been produced in a supplemental hearing to change the outcome of the case). Because the denial of Plaintiff's request to subpoena Dr. Graves, even if erroneous, was not prejudicial, remand is not required on this issue.

**B.   __Treating Source Opinion__**[10]

Plaintiff argues that the ALJ erred during the RFC determination because she "did not conduct the required analysis in discrediting the opinions of treating specialists Drs. Graves and Toye." (doc. 10 at 31.)

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* They may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence[.]" *See Johnson*, 864 F.2d at 343 (citations omitted).

---

[10]This issue is addressed before Plaintiff's second issue because it involves an earlier stage of the disability determination process.

Although every medical opinion is evaluated regardless of its source, the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2).[11] A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* at § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* at § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See Id.* at § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* Nevertheless, "absent reliable medical evidence from

---

[11]On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Because Plaintiff filed her application before the effective date, the pre-2017 regulations apply.

a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458. Additionally, "where the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

### 1.    Dr. Graves

Plaintiff contends that the ALJ erred by failing to give controlling weight to Dr. Graves's medical opinions as her treating physician. (doc. 10 at 33-37.)

Dr. Graves saw Plaintiff at Metrocare once to provide a functional disability assessment on Plaintiff's mental impairments. (doc. 7-1 at 484.) He diagnosed major depressive disorder and generalized anxiety disorder and noted a GAF score of 49. (doc. 7-1 at 482.) He opined that Plaintiff had an "extreme loss of ability" to carry out detailed but uninvolved instructions, maintain regular attendance and be punctual within customary tolerances, perform at a consistent pace without an unreasonable number and length of breaks, accept instructions and respond appropriately to criticism from supervisors, behave in an emotionally stable manner, cope with normal work stresses, and finish a normal work week without interruption from psychologically based symptoms. (*Id.* at 481-

82.) He determined that she had a "substantial loss of ability" to act appropriately with the general public, get along with co-workers or peers, and respond appropriately to changes in a routine work setting. (*Id.*) He concluded that Plaintiff's symptoms or treatment would cause her to be absent from work for more than four days a month, and that her mental disorders were likely to exacerbate the degree of disability she experienced from her physical impairments. (*Id.* at 483.)

The ALJ ultimately assigned "very little weight" to Dr. Graves's opinion, finding the "extreme dysfunction stated in the opinion" inconsistent with the objective medical evidence of record. (*Id.* at 816.) She pointed out that Plaintiff "was only diagnosed with depression recently, well after her application date," and that she was noted to have no mental deficits and no memory or other issues "at her various appointments with her neurologist and rheumatologist from 2011 to 2014," and that her mental status exams were noted as normal at her medical visits in October and December 2014. (*Id.*) The ALJ attributed "great weight" to the ME's review of medical evidence and opinion that Plaintiff did not have severe mental impairments during the relevant period, that she was "functionally independent and had, at most, slight limitations that had no effect on her ability to work," and that the medical record contradicted Dr. Graves's opinion. (*Id.*)

Plaintiff has not shown that Dr. Graves is a treating source. Other than the assessment he provided on Plaintiff's functional limitations, Dr. Graves was mentioned only once in the medical record as the "billing clinician" at Plaintiff's appointment at Metrocare on October 29, 2013, and there are no medical documents in the administrative record that Plaintiff ever met with Dr. Graves, or that he signed off on her records.[12] (doc. 7-1 at 463); *see* 20 C.F.R. § 404.1502 (explaining that

---

[12]To the extent that Plaintiff is arguing that Metrocare itself should be considered a "treating physician" and given controlling weight, courts in this district have differentiated between the medical opinions of various doctors at Metrocare when considering the opinions of treating physicians. *See, e.g., Payne v. Colvin*, No. 3:14-CV-2557-BH, 2016 WL 5661647, at *12 (N.D. Tex. Sept. 28, 2016) (finding no error when the ALJ determined that a Metrocare

a treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant).  The ALJ did not err by failing to find that Dr. Graves was a treating physician whose opinion deserved controlling weight under 20 C.F.R. §§ 404.1527(c) and 416.927(c) because there is no record evidence that Dr. Graves actually was Plaintiff's treating physician. *See Hernandez v. Heckler*, 704 F.2d 857, 860-61 (5th Cir. 1983) (affirming finding that a doctor who saw claimant twice in a 17 months was not a treating physician); *see also Robinson v. Astrue*, 271 F. App'x 394, 396 (5th Cir. 2008) ("Wong performed a one-time consultative examination of Robinson and therefore is not due special deference as a treating physician.").  Further, the ALJ specifically noted the inconsistency between Dr. Graves's opinion of "extreme dysfunction" and other record evidence showing her having no mental deficits and generally normal mental status exams. (*See* doc. 7-1 at 816.)  As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available, and the record as a whole. *See Walker v. Barnhart*, 158 F. App'x 534, 535 (5th Cir. 2005) (citing *Newton*, 209 F.3d at 458).  Substantial evidence properly supports the ALJ's appropriate evaluation of Dr. Graves's medical opinion.[13]  Accordingly, a reviewing court must defer to the

---

supervising psychiatrist was not a treating source because it was "not clear if she actually examined the plaintiff in person because the 'service provider' listed by Metrocare Services was actually [a different individual]"); *Bookman v. Colvin*, 3:13-CV-4428-B, 2015 WL 614850, at *8 & n.3 (N.D. Tex. Feb. 12, 2015) (noting the inconsistency between the medical records of the treating physician at Metrocare and other Metrocare professionals).

[13]Although Plaintiff had a GAF score of 49, "federal courts have declined to find [ ] a strong correlation between an individual's GAF score and the ability or inability to work." *Jackson v. Colvin*, No. 4:14-CV-756-A, 2015 WL 7681262, at *3 (N.D. Tex. Nov. 5, 2015) (citing 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000). Furthermore, "in the updated version of the DSM, the American Psychiatric Association no longer recommends the use of the GAF scale as a diagnostic tool for assessing a patient's functioning due to 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.' " *Spencer v. Colvin*, No. EP-15-CV-0096-DCG, 2016 WL 1259570, at *6 n.8 (W.D. Tex. Mar. 28, 2016) (quoting *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* p. 16 (5th ed. 2013)).

ALJ's decisions. *See Leggett*, 67 F.3d at 564. Remand is not required on this issue.

###### 2. Dr. Toye

Plaintiff contends that the ALJ erred because she failed to properly evaluate Dr. Toye's medical opinions. (doc. 10 at 31-33.)

Dr. Toye treated Plaintiff for pain management between November 2012 and January 2013, and assessed her with diabetic neuropathy and fibromyalgia. (*See* doc. 7-1 at 440-50.) Dr. Toye's treatment notes indicated that Plaintiff had tenderness in her calves, an antalgic gait, and reduced strength with hip flexion, knee extension, and dorsiflexion, likely from decreased effort or pain. (*Id.* at 450.) Plaintiff reported that her pain increased with prolonged periods of work, it worsened after standing for 10 minutes, and it decreased with medication and rest. (*Id.* at 443-50.) Dr. Toye completed a medical source statement for Plaintiff on January 2, 2013. (*Id.* at 441.) She opined that Plaintiff was unable to sit through a full day of work due to increased pain, and that she should remain off work for 3 to 4 weeks to adjust to her pain patch. (*Id.*) She concluded that Plaintiff could return to work but with restrictions, including decreased work hours and frequent breaks. (*Id.*)

The ALJ considered Dr. Toye's medical source statement and attributed some weight to her opinion that Plaintiff could not sit through a full day of work, and that she could return to work in 3 to 4 weeks. (doc. 7-1 at 816.) She determined that it was consistent with the medical evidence that Plaintiff was not disabled for twelve consecutive months, and that she "should have been able to return to work with the above limitations, after adjusting to her prescription regimen." (*Id.*)

The ALJ implicitly rejected Dr. Toye's opinion that Plaintiff's work hours should be decreased and that she receive frequent breaks, as these limitations were not included in her RFC. (*See* doc. 7-1 at 812.) Although the ALJ's decision does not identify Dr. Toye as Plaintiff's treating

physician, the Commissioner does not dispute that she qualifies as a treating source under 20 C.F.R. § 404.1502. (*See* docs. 7-1 at 816; 11 at 17.)  Because there was no competing medical opinion from an examining physician, the ALJ was required to apply the six factors before refusing to accept parts of Dr. Toye's opinion. *See Walker*, 158 F. App'x at 535 (quoting *Newton*, 209 F.3d at 458).  While the ALJ's decision explained that opinion evidence had been considered "in accordance with the requirements of 20 CFR 404.1527 and 416.927," it does not appear to clearly consider or apply these factors. (doc. 7-1 at 812.)  The decision does not address that Dr. Toye was Plaintiff's treating physician from November 2012 through January 2013, that Dr. Toye's treatment notes indicated that Plaintiff had complained of increased pain with prolonged periods of work, and that her pain decreased with medication and rest. (*See* doc. 7-1 at 443-50); *see Abadie v. Barnhart*, 200 F. App'x 297, 298 (5th Cir. 2006) (holding that the "ALJ was not required to accept [the treating source's] opinions, but was required to consider them, and if he chose to reject them, to explain what conflicting evidence informed his choice").

Even if there was medical evidence from a treating or examining source controverting Dr. Toye's medical opinions, and the ALJ was not required to undergo a detailed analysis of the six factors, she was still required to provide "an explanation of the rejected medical opinion[s], or an explanation of what weight was assigned." *See Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017); *see also Gomez v. Barnhart*, No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D. Tex. Nov. 5, 2004) ("[A]n ALJ who rejects the opinion of a treating physician must explain his reasons for doing so.").  Because the ALJ's decision did not address consideration of the necessary factors under 20 C.F.R. §§ 404.1527(c) and 416.927(c), the ALJ erred when evaluating Dr. Toye's treating source opinion. *See Kneeland v. Berryhill*, 850 F.3d at 760 (explaining that "absent reliable medical

evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physicians views under the criteria set forth in [20 C.F.R. § 404.1527(c)(2)]") (emphasis in original).

## B.  **Harmless Error**

Having found error, the Court must still consider whether the ALJ's failure to address or properly evaluate Dr. Toye's opinions was harmless. *See Kneeland*, 850 F.3d at 761-62 (applying harmless error analysis where the ALJ failed to address or evaluate an examining physician's opinion); *McNeal v. Colvin*, 3:11-CV-02612-BH-L, 2013 WL 1285472, at *27 (N.D. Tex. Mar. 28, 2013) (applying harmless error analysis to the ALJ's failure to properly evaluate treating opinion under 20 C.F.R. § 404.1527(c)).

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the ALJ's decision might have been different had she addressed or properly considered Dr. Toye's opinions regarding her functional limitations. *See id.* at 816 (citing *Newton*, 209 F.3d at 458).

35

As noted, Dr. Toye opined that Plaintiff's fibromyalgia and diabetic neuropathy made sitting and working through an entire day very painful, and that she required decreased work hours and frequent breaks. (doc. 7-1 at 441.)  As also noted, the ALJ did not address or consider these opinions from Dr. Toye. (*See id.* at 816.)  "[S]uch an error makes it impossible to know whether the ALJ properly considered and weighed an opinion, which directly affects the RFC determination." *Kneeland*, 850 F.3d at 762.  It is not inconceivable that the ALJ would have reached a different conclusion had she considered her opinions. *See id.* (stating that if the examining physician's opinions were "afforded some weight, the ALJ's RFC would surely have been different.").  While it is possible that the ALJ considered and rejected Dr. Toye's opinions, there is no way of knowing because she failed to address or provide any explanation of Dr. Toye's opinions regarding Plaintiff's functional limitations. *Id.* It is unclear whether she would have adopted Dr. Toye's opinions and further limited Plaintiff's RFC, particularly since Dr. Toye opined that Plaintiff could not sit or stand for long periods of time without breaks and could only work if her hours decreased.  Even if the ALJ had considered and afforded those opinions no weight at all, it is not the reviewing court's duty to "substitute its judgment of the facts for the ALJ's, speculate on what the ALJ could have done or would do on remand, or accept a post hoc rationalization." *See Benton v. Astrue*, No. 3:12-CV-0874-D, 2012 WL 5451819 at *8 (N.D. Tex. Nov. 8, 2012).

It is not inconceivable that the ALJ might have increased the limitations to Plaintiff's abilities to sit, stand, or walk in the RFC had she properly considered Dr. Toye's opinions. *See McAnear v. Colvin*, No. 3:13-CV-4985-BF, 2015 WL 1378728 at *5 (N.D. Tex. Mar. 26, 2015) (finding remand was required because there was a realistic possibility of a different conclusion by the ALJ where the court was unsure of whether the ALJ considered the medical source's opinion

and whether such a review would have changed the outcome of the decision).  As in *Kneeland*,
"[t]his, in turn, would likely have affected the jobs available at step five of the sequential evaluation
process, and [Plaintiff] may have been found disabled." 850 F.3d at 762.  Moreover, the VE had
testified that an individual with the ALJ's RFC could not be absent more than one day off work, or
be off task for breaks more than 15 percent of the time, to maintain and sustain employment. (*See*
doc. 7-1 at 865.)  The ALJ's error was not harmless because it is not inconceivable that she would
have reached a different decision had she addressed and explained the weight given to Dr. Toye's
opinions, or formally considered her opinions under 20 C.F.R. §§ 404.1527(c) and 416.927(c). *See
Kneeland*, 850 F.3d at 761-62 (finding that the error was not harmless where the ALJ failed to
address or properly consider an examining physician's opinion); *see also Singleton v. Astrue*, No.
3:11-CV-2332-BN, 2013 WL 460066, at *6 (N.D. Tex. Feb. 7, 2013) (finding the ALJ's failure to
consider a medical source opinion was not harmless error because the court could not say what the
ALJ would have done had he considered the opinion, and had he considered the opinion he might
have reached a different decision).[14]  Accordingly, the error is not harmless, and remand is required
on this issue.[15]

## IV. RECOMMENDATION

The Commissioner's decision should be **REVERSED in part**, and the case should be

---

[14]Plaintiff contends that the proper recourse is remand with instruction to award benefits. (doc. 10 at 45.)  If
an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make
an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong
v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at * 10 (N.D. Tex. Sept. 22, 2009).  The claimant must carry "the
very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). The Commissioner,
not the court, resolves evidentiary conflicts. *Newton*, 209 F.3d at 452.  Inconsistencies and unresolved issues in the
record therefore preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005)
(per curiam).  The record in this case is insufficient to remand with instruction to award benefits.

[15]Because the ALJ's error in evaluating Dr. Toye's opinions necessitates remand, and determination of this
issue will likely effect the remaining issue, it will not be addressed here.

37

**REMANDED** for further proceedings.

**SO RECOMMENDED**, on this 31st day of August, 2020.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

38